**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-317 (2) (TSC)** |
| **CHRISTIAN CORTEZ,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christian Cortez to four months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

The defendant, Christian Cortez, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

Cortez and his co-defendant, Benjamin Larocca, drove from Texas to Washington, D.C., to attend the former President's "Stop the Steal" rally, and subsequently joined the crowd as it marched to the Capitol Grounds. Cortez and Larocca arrived on Capitol Grounds after major breaches at the perimeter of the grounds had occurred, and likely after rioters breached the Upper

---

[1]    As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police.

West Terrace and the interior of the Capitol Building.  At this same time, around 2:30 p.m., police on the West Front were engaged in hand-to-hand combat with rioters, fighting for their lives, and unable to stem the tide of rioters streaming into the Capitol Building.  Cortez and Larocca spent time on the West Lawn, where they saw rioters scaling the walls of the Capitol Building, before making their way to the Upper West Terrace.  They were in close proximity to the violence being committed against police as they ascended the Northwest Stairs to reach the Upper West Terrace.

Cortez and Larocca breached the Capitol Building through the Parliamentarian Door at approximately 2:53 p.m.  Once inside, they joined a pack of rioters in the Brumidi Corridors facing off with police officers who were trying to prevent rioters' from further penetrating the building. There, Cortez and Larocca joined in chants and taunted the officers.  After being directed to exit by Capitol Police, Cortez and Larocca left through the Capitol's North Doors, approximately thirteen minutes after entering the building.

Rather than leave Capitol Grounds, however, Cortez and Larocca joined a crowd immediately outside the North Doors attempting to prevent Capitol police from securing the Doors.  Cortez moved to the front of the crowd and, followed by a group of other rioters, attempted to reenter the building.  Police used OC spray and fire extinguisher retardant to repel Cortez and those around him.  Undeterred, Cortez yelled to his fellow rioters to "Hold our positions!" and again attempted to enter the building.  He did so despite blaring alarms and the police's repeated use of crowd-dispersal ordinance from just inside the doorway.

Following the police officers' attempt to take a violent rioter into custody, the crowd outside the North Doors grew more agitated.  As police attempted to reestablish their defensive position and close the doors, Cortez stepped in front of the crowd and began screaming directly at the police: "Fuck you!" and "Oath breakers!"  Cortez had been holding a large blue flag on a pole,

which he slammed onto the ground as he yelled at the police.  Officers diverted their attention from the doors to Cortez, attempting to repel him with OC spray.  Rather than back down, Cortez continued to scream at them: "Do it some fucking more! Do it some fucking more!"[2]

Later that day, Cortez posted a "selfie" to Instagram showing himself smiling, red and bleary-eyed, about 500 feet from the North Doors, still on Capitol grounds, with police officers in the background.



Cortez posted a caption with the image that read: "Just hanging with the besties."  In response to another commenter, Cortez posted the following comment: "we were not the violent ones, but definitely got fucked up … I will fight for your freedom until I die. I swear it."

The government recommends that the Court sentence Cortez to 4 months' incarceration, within the advisory Guidelines' range of 0-6 months, which the government submits is the correct Guidelines calculation.  A 4-month sentence reflects the gravity of Cortez's conduct and the

---

[2]     While co-defendant Larocca witnessed this confrontation, he did not participate in it himself.

serious threat to the safety of police officials that his conduct presented, while acknowledging his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Cortez among them, attacked the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.  Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.  Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Statement of Offense incorporated into Cortez's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.  Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol.  Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.  At approximately 1:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.  Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 12-18.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's defenses until the building itself was accessible and the occupants were at risk.  The physical

breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the Capitol Police were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen Capitol Police officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping

over and pushing down the unmanned bicycle rack barricades at the Peace Circle and advancing into the restricted area to engage with Capitol Police officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of Capitol Police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier. They flooded the area labeled "Lower West Plaza," Area B on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from U.S. Capitol Police security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with Capitol Police officers at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper

balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of an officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers, responding to Capitol Police officers' calls for help, began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol Building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett

Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021 attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

## B.    Christian Cortez's Role in the January 6, 2021, Attack on the Capitol

On January 4, 2021, Christian Cortez and his co-defendant, Benjamin Larocca, drove from their home[3] in Seabrook, Texas, to Washington, D.C., to attend the former President's "Stop the Steal" rally.  On January 6, the defendants decided not to attend the rally because they did not want to wait to be admitted to the cordoned-off area at the White House Ellipse, where the rally was principally held and where the former President was giving a speech.  They were nonetheless able

---

[3]    On and after January 6, 2021, Larocca and Cortez were roommates.

to hear the speech over loudspeakers outside of the Ellipse.  As the crowd at and near the Ellipse began to march to the Capitol, Cortez and Larocca marched among them.

As Larocca and Cortez approached the Capitol, and later while they were inside the Capitol, they both recorded photos and videos on their cell phones, some of which they posted to the social media platform, Instagram, during and immediately after the riot.  When Larocca and Cortez arrived in the vicinity of the Capitol, rioters had successively breached the outer perimeter of the grounds, the Lower West Terrace, and the Upper West Terrace.  They saw other rioters climbing the walls of the building and using bike rack barriers—previously deployed by United States Capitol Police to block entry to Capitol grounds and the Lower West Terrace but since been cast aside by rioters—as ladders to gain access to the West Front Upper Terrace.  As can be seen and heard in Larocca and Cortez's photos and videos, the crowd surrounding the Capitol was raucous and numbered in the thousands.



*Exhibit 5 – "Selfie" taken by Cortez showing rioters scaling the walls on the left side of the Capitol*

Between approximately 2:40 and 2:50 p.m.,[4] Larocca and Cortez made their way to the Upper West Terrace on the Senate side of the Capitol building via the Northwest Stairs.[5]  From there, Larocca and Cortez breached the Capitol building at approximately 2:53 p.m. through the Parliamentarian Door.  Both Larocca and Cortez recorded their entry on their cell phones as they crossed the threshold of the Capitol building.



*Exhibit 6 – Larocca and Cortez's entry into the Capitol building at 2:53 p.m. as visible on CCTV; Larocca is highlighted by the larger red rectangle towards the bottom of the frame, Cortez is highlighted by the smaller red rectangle towards the top of the frame.*

Once inside the building, Larocca and Cortez proceeded to the Brumidi Corridors,[6] where they joined a crowd of rioters chanting and facing off with police who were trying to block the

---

[4]     This estimated time window is based on metadata from Larocca's and Cortez's photos and videos taken from their cell phones.

[5]     The stairs are marked as "Area C" on Government's Exhibit 1, *see infra* at 6.

[6]     The Brumidi Corridors are ornate hallways on the first floor of the Capitol on the Senate side of the building.  Police guarded the Corridors heavily throughout the riot due to their proximity to the Senate Chamber and members of Congress' evacuation routes.

14

rioters' passage.  Larocca posted videos showing himself and Cortez in the Brumidi Corridors to his Instagram story.[7]



*Screenshot from Larocca's Instagram story, showing Larocca inside the Brumidi Corridors,*
*facing U.S. Capitol Police, and including the caption, "We got in."*

Capitol Police began directing rioters in the Brumidi Corridors to exit the building through the North Doors.  Larocca and Cortez exited through the North Doors at approximately 3:06 p.m. In their 13 minutes inside the Capitol Building, Larocca and Cortez did not cover a lot of ground— the distance from the Parliamentarian Door to the North Doors is relatively short, as shown below in Exhibit 7.  However, any progress they intended to make through the building's interior was hampered by the heavy police presence in the Brumidi Corridors.

---

[7]     An Instagram "story" shows one or more photos or videos in 15-second clips.  The clips remain in the user's story and are visible to the user's "followers" for 24 hours.  If the user's Instagram is "public," anyone can view the user's story, not just their followers.  Instagram users frequently, but not universally, post such photos and videos to their story contemporaneous to the events that the photos or videos depict.  Larocca's Instagram story was submitted to this Court in aid of Larocca's sentencing and was marked as "Exhibit 1."



*Exhibit 7 – Map of the First Floor of the Capitol Building; Arrows show Larocca and Cortez's approximate path from the West Lawn, up the Northwest Stairs, to the Parliamentarian Door (marked "P") through the Brumidi Corridors, and out the North Doors (marked "N")*

Once outside, Larocca and Cortez did not vacate the restricted area of the Capitol Grounds. Instead, they again joined with a crowd agitating against the police outside the North Doors. At this point, police were trying to close the North Doors and prevent additional rioters from entering the Capitol. A continuous, high-pitched alarm blared and smoke from crowd-suppression ordinance[8] emanated from inside the Doors, but rioters, including Larocca and Cortez, were not deterred.

---

[8]   Likely tear gas or fire-extinguisher retardant. Police, who were spraying from inside the North Door vestibule, are not visible in videos during this time.

Cortez was a leader in this crowd. Despite police orders to back off, Cortez remained at the front of the pack.[9]



*Exhibit 8A - Screenshot from Exhibit 8 at marker 11:35 showing Cortez as the member of the mob closest to police officers at the North Doors*

At approximately 3:15 p.m., with officers positioned at the inner doors, alarms blaring, and smoke emanating from the doorway, Cortez led a group of rioters into the North Doors vestibule, attempting to regain entry.

---

[9]   Exhibits 8A-8F are screenshots from an open-source video, a copy of which has been submitted to the Court and marked as Exhibit 8. The video is also available at https://www.youtube.com/watch?v=9TshRdxXi9c



*Exhibit 8B - Screenshot from Exhibit 8 at marker 12:35 showing Cortez leading a group of rioters into the North Doors vestibule, trying to gain entry.*

After being sprayed in the face by police officers, Cortez again chose not to leave the area. Instead, approximately one minute later, and despite a cloud of smoke, Cortez again led a group of rioters in an attempted breach of the doors, yelling "Hold our position!" before trying to push through.



*Exhibit 8C - Screenshot from Exhibit 8 at marker 13:26 showing Cortez in a cloud of smoke leading a group of rioters into the North Doors vestibule, trying to gain entry.*

Once again, Cortez and the other rioters were repelled by police spraying; yet again, Cortez decided not to leave, staying nearby in the crowd.

The security situation outside the North Doors rapidly deteriorated at this point. Less than a minute after Cortez's second attempt to reenter the Capitol, fellow rioters began throwing projectiles at the North Doors, while others used a bike rack as a battering ram against the doors in an attempt to break them down. When a police officer began addressing the crowd (which included Cortez), a rioter in the crowd sprayed the officer in the face with a chemical irritant. As police attempted to apprehend that rioter, the crowd grew more agitated, dismantling bike rack barriers set up by the police near the North Doors and cursing at police officers. While the officers attempted to retake their position and regain control, Cortez stepped out in front of the crowd. He

began screaming directly at the officers: "Fuck you!" and "Oath breakers!"  He slammed a large

blue flag on a pole into the ground repeatedly as he screamed. at the officers.





*Exhibits 8D and 8E - Screenshots from Exhibit 8 at marker 20:20 & 20:23 showing Cortez*
*screaming at and threatening police officers while wielding his flagpole.*

The officers diverted their attention from securing the doors and sprayed Cortez with OC spray.  Rather than back down, Cortez screamed, "Do it some fucking more! Do it some fucking more!"



*Exhibit 8F - Screenshot from Exhibit 8 at marker 20:26 showing Cortez taunting police officers*

For nearly 10 minutes while police tried to close the North Doors, Cortez led rioters' efforts to prevent the officers from securing the Doors, culminating in Cortez screaming violently at the officers.[10]

---

[10]     An additional open-source video capturing Cortez's confrontation with police has been submitted to the Court and marked as "Exhibit 9."  The same video was submitted in connection with the Larocca sentencing as Exhibit 5.

Later that day, Cortez posted a "selfie" to Instagram showing himself with a satisfied expression, red and bleary-eyed, standing about 500 feet from the North Doors, still on Capitol grounds, with police officers in the background.  Cortez posted a caption with the image that read: "Just hanging with the besties."



*Exhibit 10 – "Selfie" posted by Cortez to his Instagram*

Larocca posted a comment: "Hahaha."   In response to another commenter, Cortez posted a comment: "we were not the violent ones, but definitely got fucked up … I will fight for your freedom until I die. I swear it."

## III.    THE CHARGES AND PLEA AGREEMENT

On April 23, 2021, a federal grand jury in the District of Columbia returned a five-count Indictment charging Christian Cortez and Benjamin Larocca with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(2);

Disorderly Conduct in a Capitol Building, in violation of 40 USC § 5104(e)(2)(D); and Parading,

Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC § 5104(e)(2)(G).

On May 20, 2022, the government filed a one-count Superseding Information charging

Christian Cortez with Obstructing or Impeding Officers During a Civil Disorder, in violation of

18 USC § 231(a)(3).   On May 25, 2022, Christian Cortez pleaded guilty to the Superseding

Information.   As part of the plea agreement, Cortez agreed to pay $2000 in restitution to the

Architect of the Capitol.

## IV.    STATUTORY PENALTIES

Cortez now faces sentencing on a single count of Obstructing or Impeding Officers During

a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).   As noted by the plea agreement and the

U.S. Probation Office, Cortez faces up to five years of imprisonment, a fine of up to $250,000, and

a term of supervised release of not more than three years.   (Plea Agreement ¶1; PSR ¶¶86, 103,

92.)

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at

49.

The PSR calculates the Sentencing Guidelines applicable to Cortez's offense consistent with the parties' plea agreement. That Guidelines analysis is as follows:

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| Adjustment for Acceptance of responsibility (U.S.S.G. § 3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **8** |

(*See* Plea Agreement at ¶ 5(A).)

The U.S. Probation Office calculated Cortez's criminal history as category I, which is not disputed. (PSR ¶ 47.) Accordingly, based on the government's calculation of Cortez's total adjusted offense level (after acceptance of responsibility) at 8, Cortez's Guidelines imprisonment range is 0 to 6 months. Cortez's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. (*See* Plea Agreement at ¶ 5(A).)

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this felony case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a significant term of incarceration in the upper half of the Guidelines range.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.  As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.  Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

This Court should assess Cortez's individual conduct in the context of certain aggravating and mitigating factors, to include:  (1) whether, when, and how the defendant entered the Capitol Building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Cortez's offense are extreme and weigh heavily towards a significant term of incarceration. On January 6, 2021, Cortez was an agitator and a leader of agitators. While police attempted push the mob back and regain control of the Capitol Building's North Doors, again and again, Cortez got in the way. Cortez's obstruction of police culminated in the moment when, just as police were about to succeed in shutting the North Doors, Cortez stepped in front of the doorway and screamed at officers: "Fucking oath breakers!" And when the police deployed fire extinguishers and OC spray to get him to stand back, Cortez screamed, "Do it more! Do it some fucking more!" Cortez's aggression in this moment threatened officer safety such that they had to deploy non-lethal force—not just to disperse the crowd, but—to disperse Cortez, specifically. Moreover, by directing the officers' attention towards him rather to the exclusion of closing the Doors, Cortez directly interfered with the officers' efforts to secure the Capitol Building.

Beyond his own interference with police, Cortez yelled instructions to other rioters in the crowd, leading the charge to retake the Capitol. As he charged the North Doors, he yelled for the mob to "Hold our positions!" Cortez directed rioters to disobey police dispersal orders. And incited violence against the officers—rioters in this crowd chucked projectiles at officers penned in the North Door vestibule, sprayed officers with chemical irritants, and used a bike-rack barricade as a battering ram. Cortez did this amidst blaring alarms and billowing smoke. Cortez could have backed off at any time. He could have deescalated and left the Grounds after being directed to do so by police. Instead, he turned up the temperature. He led rioters in an attack that almost succeeded in preventing the North Doors form being secured.

Before he got anywhere close to police at the North Doors, Cortez witnessed mayhem in and around the Capitol. Cortez photographed protestors climbing walls and doors of the Building

that had been broken and breached.  Instead of leaving the scene, or even standing back to watch, Cortez headed straight into the building.  Once inside, he joined a group of rioters engaged in a direct confrontation with police officers, who were positioned in a defensive formation and were vastly outnumbered.  By entering the building and joining up with the group, Cortez demonstrated clear disregard both for the law and for law enforcement officials, and contributed to a dangerous, volatile situation inside the Capitol Building.  He was repeatedly directed by police to leave, and repeatedly chose to remain and further escalate an already dangerous situation.

Cortez also showed no remorse in the aftermath of the riot.  Instead, he posted a selfie of himself near the Capitol, while the situation was still out of control, with a sarcastic caption referring to the police as "the besties."  In response to another individual's comment on the picture, Cortez added, "we were not the violent ones, but definitely got fucked up … I will fight for your freedom until I die. I swear it."  His lack of remorse underscores the purposefulness of his conduct and demonstrate a willingness to incite and engage in violence.

Cortez's criminal conduct January 6 was egregious.  Cortez was a leader among violent and volatile rioters who attacked police.  Cortez himself verbally assaulted police, directly threatening their safety and preventing them from protecting the Capitol and members of Congress. Cortez was proud of his actions at the Capitol, as his Instagram activity shows.  He wanted people to know what he had done.  He wanted people to know that he was a fighter.  The seriousness of this offense calls for a significant sentence of imprisonment.

### B.  Cortez's History and Characteristics

Cortez is a former photographer, carpentry apprentice, and IT manager.  He is currently employed in set design and lives with his mother and his stepfather; he is single and has no dependents.  He has no criminal history and has been compliant with his conditions of release.

According to the PSR, Cortez suffers from Tarui Disease, which causes fatigue following moderate exercise.  Cortez has received medical treatment for the disease for years, and it appears to be under control.  (PSR ¶58.)  Cortez's health condition does not prevent him from engaging in gainful employment.  Nor did it prevent his very aggressive conduct towards police officers on January 6.  As such, it should not deter the Court from imposing a carceral sentence.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Cortez's criminal conduct—obstructing and impeding police officers engaged in a federally protected function during a civil disorder—is the epitome of disrespect for the law.  When Cortez entered the Capitol grounds, and the Capitol itself, it was abundantly clear to him that lawmakers and their staff, and the police officers who tried to protect them, were under siege.  Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.  The rule of law was not only disrespected; it was under attack that day.  A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct and impede police officers are not taken seriously.  In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[11]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                                                           at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.        The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See id.* at 46 ("I

---

[12]        *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration. Although Cortez has accepted responsibility for this offense by entering a guilty plea, he has yet to exhibit any meaningful remorse for this conduct on January 6 and it is not clear that he has ever grasped the gravity of his personal role in the riot. He has yet to acknowledge the threat he personally posed to police officers' safety, much less apologize. To the contrary, his social media statements after the riot were those of a man girding for another battle. Cortez's own statements that he "will fight for your freedom until I die. I swear it" underscores his desire—even in the face of the forceful police response he directly experienced—to obstruct and undermine legitimate government proceedings.

To the extent that Cortez expresses remorse before this Court at his sentencing hearing, the government respectfully encourages the Court to exercise caution in crediting those sentiments. While the government encourages contrition and believes it to be an important part of accountability, some January 6 defendants have expressed remorse at their sentencings only to turn around and recant that remorse, even seeking to profit from their prosecution, as this Court has explained. *See United States v. Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of

Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions."); *see also United States v. Derrick Evans*, 1:21-cr-337 (RCL), ECF No. 52, "Notice of Defendant's Post-Sentencing Statements" (06/30/2022).

On and after January 6, Cortez made a series of deliberate choices. He could have stayed near the rally, peacefully protesting, but he chose to march on the Capitol and enter restricted grounds. Upon arriving at the Capitol Grounds, he could have stayed outside the Capitol Building, but chose instead to go inside. After being directed to leave the building, Cortez could have vacated Capitol grounds; instead, he joined another mob outside the North Doors and worked his way to the front of that crowd. When he saw vastly outnumbered police trying to secure the North Doors, he could have respected the police line; instead, he chose to try and breach it, screaming at and taunting the officers. And when it was all over, Cortez could have been contrite or remorseful about his actions, but he chose to disseminate a picture publicly displaying his pride at what he had done. A meaningful term of incarceration is necessary and appropriate in this case to impress upon Cortez the significance of his actions and to deter him from taking such actions again in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base

its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

As to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—

"'the Sentencing Guidelines are themselves an anti-disparity formula.'"  *United States v. Sanchez*,

989 F.3d 523, 540 (7th Cir. 2021) (quoting *United States v. Blagojevich*, 854 F.3d 918, 921 (7th

Cir. 2017).  Generally, when a district court "correctly calculated and carefully reviewed the

Guidelines range, [the district court] necessarily gave significant weight and consideration to the

need to avoid unwarranted disparities."  *Gall*, 552 U.S. 38, 54 (2007).  Put another way, "'the best

way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat

similar offenses and offenders similarly.'"  *Sanchez*, 989 F.3d at 541 (quoting *United States v.

Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).

The crimes that Cortez and others like him committed on January 6 are unprecedented.  For

that reason, his violation of 18 U.S.C. § 231(a)(3) is not comparable to § 231(a)(3) offenses

committed in non-January 6 circumstances.  To mechanically compare other defendants before

January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

To date, seven January 6 defendants have pleaded guilty to, and been subsequently

sentenced for, a single count of violating 18 U.S.C. § 231(a)(3):  *See United States v. Daniel

Johnson and Daryl Johnson*, 21-cr-407-DLF; *United States v. Nolan Cooke*, 22-cr-52-RCL;

*United States v. Derrick Evans*, 21-cr-337-RCL; *United States v. Andrew Griswold*, 21-cr-459-

CRC; *United States v. David Blair*, 21-cr-186-CRC; *United States v. Moises Romero*, 21-cr-677-

TSC.   While the defendants' individual actions vary widely across these cases, with one

exception,[13] judges in this District have imposed Guidelines incarceration sentences in each of

---

[13]      In *Blair*, there was a miscalculation of the Sentencing Guidelines as part of the plea
agreement; Judge Cooper consequently chose to vary downward from the (higher) recalculated
Guidelines range.

them.  For the purposes of considering sentencing consistency with regards to Cortez, the most relevant sentences to consider are those for Daniel Johnson (4 months' incarceration) and Derrick Evans (3 months' incarceration).  This Court's recent 366-day sentence for Moises Romero also provides a helpful point of reference.

Daniel Johnson and his father, Daryl, entered the Capitol as part of the second wave of rioters on the west side, climbing through a broken window and joining the crowd inside the building on the east side.  The Johnsons helped other rioters overwhelm a group of outnumbered officers to allow more rioters to enter the building through the Columbus doors on the east side, indirectly putting officers and others at risk of serious injury.  Both defendants pleaded guilty to a single count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Daniel Johnson's Guideline range was 4-10 months, while his father's was 0-6 months.  The Court gave both defendants Guideline sentences of 4 months (Daniel) and 30 days (Daryl) incarceration.  Judge Friedrich pointed to the "enormous risk" that the Johnsons' actions created for police officers and the potential for "serious injury" as weighing "in favor of imposing a term of imprisonment."  *See Johnson*, 21-cr-407 (DLF), Tr. 6/1/2022 at 59.  The Judge also emphasized that, but for Daryl Johnson's "exemplary record to date in the community," she would have sentenced him to a longer period of incarceration.  *Id.* at 5.  Given Cortez's role in exposing police officers to serious risk of injury by agitating against them, riling up his fellow rioters to "hold our position," menacing officers with his flagpole, and diverting them from their essential task of securing the Capitol, and given the absence of any "exemplary record" to his community, a sentence of 4 months' incarceration – directly in line with Daniel Johnson's – would not result in any unwarranted sentencing disparity.

Evans, a West Virginia state legislator at the time of the riot, joined the storming of the Rotunda Doors after livestreaming the mob on the east side of the Capitol to his public Facebook page. While rioters at the front of the mob assaulted police, Evans—from approximately 20 feet back—yelled encouragement.  After the doors were breached, Evans enthusiastically pushed forward and entered the Capitol.  Like Evans, Cortez played a leadership role among a group of violent rioters seeking entry into the Capitol by force, yelling commands and encouragement. Unlike Evans, Cortez not only encouraged and aided those around him, but directly threatened and taunted police officers, and sought, on his own initiative, to lead the charge and break through police lines.  For Evans, the court imposed a sentence of three months' incarceration, in the middle of the Guidelines range.  A sentence of four months' incarceration for Cortez would recognize the additional threat Cortez posed to police, as well as his blatant disregard for police officers and their safety, without resulting in an unwarranted sentencing disparity in 18 U.S.C. § 231(a)(3) cases.

This Court's most recent 18 U.S.C. § 231(a)(3) sentencing involved Moises Romero, who was part of a mob that physically assaulted a group of police officers.  Romero himself grabbed a police officer's shield as part of this altercation.  Given the direct physical contact, Romero received a Guideline enhancement under U.S.S.G. § 2A2.4(b)(1)(A), increasing his Guidelines range to 8-14 months, and was sentenced to 366 days' incarceration.

Cortez's actions fall short of direct physical contact; a shorter overall sentence is therefore justified as per the Guidelines.  However, it is worth recognizing that the potential of serious harm to police officers stemming from Cortez's behavior was hardly less significant than in Romero's case. Cortez was carrying a flagpole and behaving in a menacing manner; the police's success in preventing any further actions by him (through the use of OC spray and fire extinguisher retardant) does not diminish the real threat of physical harm Cortez presented.  Cortez's calls to "hold our position" and his agitation of a crowd that, only minutes later, threw projectiles and used bike racks as a battering

ram, contributed directly to an atmosphere of serious danger for police officers.  Given these parallels,

Cortez should receive a sentence similar to Romero's given the similar effects of their behavior.

This Court should also consider the sentence imposed on Cortez's codefendant, Benjamin

Larocca.  On August 10, 2022, this Court sentenced Larocca to 60 days' incarceration.  Larocca

and Cortez were together throughout their time on Capitol grounds and inside the Building.  They

both taunted police in the Brumidi Corridors.  They were inside the Building for the same length

of time, leaving only after being directed to do so by police.  Cortez's conduct meaningfully differs

from Larocca's, however, during the confrontation with police outside the North Doors.  While

Larocca only witnessed the confrontation, Cortez led a group of rioters in multiple attempts to

prevent police from securing the North Doors, culminating in Cortez screaming at the officers:

"Fuck you! Oath breakers!"  A sentence of four months' incarceration for Cortez would not create

an unwarranted sentencing disparity relative to the 60-day sentence imposed on Larocca.

All that said, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," so that

"different district courts may have distinct sentencing philosophies and may emphasize and weigh

the individual § 3553(a) factors differently; and every sentencing decision involves its own set of

facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545

F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—

differently from the Sentencing Guidelines range, differently from the sentence an appellate court

might have imposed, and differently from how other district courts might have sentenced that

defendant." *Id*. at 1095. Cortez's obstruction and interference with police officers enabled other

rioters to breach the Capitol and engage in violence. This conduct merits a sentence of

imprisonment. Accordingly, a sentence of 4 months—on the higher end of the Guidelines range—would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[14]  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cortez must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Cortez played in the riot on January 6.[15]  (Plea Agreement at ¶ 12.)  As the plea agreement reflects, the riot at the United States Capitol had caused

---

[14]     The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.  *See* 18 U.S.C. § 3663A(c)(1).

[15]     Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, see U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. See *United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the

Architect of the Capitol in mid-May 2021.  *Id.*  Cortez's restitution payment must be made to the

Clerk of the Court, who will forward the payment to the Architect of the Capitol.  (See PSR ¶ 107.)

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of imprisonment of 6 months, the top of the advisory Guidelines range as calculated by

the government and as agreed upon by the parties in the plea agreement, three years' supervised

release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   _____

Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
United States Attorney's Office, Detailee
601 D Street, N.W.
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048